**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

MICHAEL E. JONES, et al.,

               Plaintiffs,

v.                                                                      CIVIL ACTION NO.   2:21-cv-00645

WEST VIRGINIA DIVISION OF CORRECTIONS
AND REHABILITATION,

               Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant West Virginia Division of Corrections and Rehabilitation's ("Defendant") Motion for Summary Judgment.   (ECF No. 27.)   For the reasons more fully explained below, the motion is **GRANTED**.

*I.     BACKGROUND*

This action arises out of the death of Michael E. Jones, II, ("Decedent") while he was incarcerated in the Eastern Regional Jail in Martinsburg, West Virginia.   (*See* ECF No. 1–1.) Plaintiff Michael E. Jones ("Plaintiff"), as the Administrator of the Estate of Michael E. Jones, II, has asserted that Defendant violated the rights and privileges of Decedent as set forth by the Eighth Amendment to the United States Constitution and Article III, Section 5 of the Constitution of the State of West Virginia.   (*See* ECF No. 1–1 at ¶ 45.)

*A. Factual Background*

On January 10, 2018, Decedent and another individual, Gary Nolan Toppings ("Toppings"), both inmates at Eastern Regional Jail in Martinsburg, West Virginia, were housed in Section E-1 at the jail.   (ECF No. 27–1 at 14, 31.)   Decedent was on the phone when Toppings approached him "in an aggressive manner."   (*Id.* at 16, 46.)   Toppings confronted Decedent over an unpaid debt from the "store bill," which was reportedly for a bag of coffee.   (*Id.* at 16.) According to one witness, inmate Christopher Shy ("Shy"), Decedent refused to pay, which upset Toppings.   (*Id.* at 16, 23–24.)   At that point, Toppings removed his shirt and walked into cell 14. (*Id.* at 16–17; ECF No. 30–5 at 1.)

Decedent then approached cell 14 and appeared to be speaking to Toppings, who was not visible inside the cell.   (ECF No. 30–5 at 1.)   Following a brief discussion between the two, Decedent walked away from the cell and spoke to other inmates in the common area of the section. (*Id.*)   After several minutes, Toppings exited cell 14 and began pacing back and forth in front of it in "an agitated state."   (*Id.*)   Decedent and Toppings spoke again in the common area, after which Toppings returned to cell 14 and Decedent followed him inside.   (*Id.*)   Decedent entered the cell "with his hands up in the air," at which point Toppings struck Decedent, knocking Decedent unconscious.   (ECF No. 27–1 at 17.)   Toppings continued to strike Decedent, hitting him "seven more time in the side of the head."   (*Id.*)   After approximately 40 seconds, Decedent regained consciousness, exited the cell, and then collapsed on the floor outside of cell 12.   (*Id.*; ECF No. 30–5 at 2.)   After a few moments, Decedent picked himself up off the floor, at which point he could be heard "snoring while he was walking," and went and sat on a table in the common area.   (ECF No. 27–1 at 17; ECF No. 30–5 at 2.)   Moments after sitting on the table, Decedent

collapsed again and appeared to lose consciousness.   (ECF No. 30–5 at 2.)   At that time, inmates inside the common area began signaling the tower correctional officer about the medical emergency, who immediately gave an "all-call" over the radio and opened the doors to the section. (*Id.*)

Medical staff responded and "began performing life saving measures" on Decedent.   (*Id.*) Emergency services were also called, and paramedics arrived on the scene approximately 13 minutes after the 911 call was placed.   (*Id.*)   Decedent was transported to Berkeley Medical Center in Martinsburg, West Virginia, but was later pronounced dead.   (*Id.*; ECF No. 1–1 at ¶ 28.) Around three hours later, Plaintiff was informed of his son's death.   (ECF Nos. 30–5 at 2; 1–1 at ¶ 29.)   Decedent's cause of death was ultimately concluded to be the result of "hypertensive and arteriosclerotic cardiovascular disease with other significant contributing condition: exertion due to physical altercation with another inmate."   (ECF No. 30–7 at 7.)   Toppings later pled guilty to voluntary manslaughter.   (ECF No. 28 at 7.)

Toppings came to be housed at the Eastern Regional Jail via transfer from another facility on December 22, 2017, where he was placed in the general population.   (ECF No. 30 at 2.)   Prior to this transfer, Defendant assessed Toppings through a document known as a "PREA[1] Screening Instrument."   (ECF No. 30–2.)   This screening document indicated that, among a list of risk factors for potential sexual predators, Toppings had demonstrated a history of "physically assaultive behavior," with no further explanation.   (*Id.*)   No other risk factors were identified, either for classification as a potential victim or potential predator.   (*Id.*)   Despite this indication

---

[1] "PREA" stands for the "Prison Rape Elimination Act ," which aims to prevent prison rape through the development and implementation of "national standards for the detection, prevention, reduction, and punishment of prison rape." 34 U.S.C. § 30302.

on the screening form, Corrections Officer Christopher Fleming noted that the screening form was only used to ensure that potential sexual predators were not housed with potential sexual victims. (ECF No. 31 at 13.)   Moreover, as the officer responsible for completing the PREA Screening Instrument, Officer Fleming did not know the specific reason for Toppings' history of physically assaultive behavior, stating that "[i]t could have been his past history, his charge, something to that nature."   (*Id.* at 12.)

Shortly after his transfer, on December 29, 2017, Toppings was reassigned from Section E-4, his initial housing assignment, to Section E-1.   (ECF No. 30–3.)   The listed reason for his reassignment was noted as "Having Problems In Section."   (*Id.*)   Two days later, on December 31, Toppings' "Reclassification and Case Review Record" was completed, which recommended that Toppings be placed in general population.   (ECF No. 30–4.)

Relevant to these assignments, Defendant maintains a specific policy with respect to the classification of inmates in its facilities.   The policy states, "Each regional jail shall provide separate housing for inmates based upon sex, legal status, propensity for violence, trusty status, and special management problems."   (ECF No. 30–1.)   From there, the policy establishes the procedures for housing, as follows:

PROCEDURE A:      At a minimum, the various housing sections in the podular living units will be designated to separate inmates in accordance with the following classifications:

    1.      Male from Female

    2.      Felons from Misdemeanants

PROCEDURE B:      In addition to the above specified separations, inmates with the following classifications will be maintained separately, unless by specific authorization of the Administrator:

4

      1.     Pretrial from convicted

      2.     Special Management from General Population

      3.     Trustees from General Population

A decision to commingle any of the above classifications will be based upon a thorough analysis of the situation, and will include a determination by the Administrator that (1) a significant need for the commingling exists, and that (2) it would be appropriate to commingle the specified individuals involved.

(*Id.*)

### B. Procedural History

This matter has a somewhat complicated procedural history. Plaintiff filed his original complaint on August 28, 2019, in the Circuit Court of Kanawha County, West Virginia, in which he asserted one ambiguous cause of action. (ECF No. 21 at 1.) Service of the complaint was completed on Defendant on August 28, 2019. (*See* ECF No. 6 at 3.) Defendant, however, filed no responsive pleadings, and Plaintiff subsequently filed a motion for default judgement on January 15, 2020. (ECF No. 5 at 1.) Defendant thereafter filed an answer to the complaint on April 3, 2020. (*Id.*) The parties then engaged in discovery while still in the Circuit Court of Kanawha County. (ECF No. 28 at 2.)

Following the completion of discovery Defendant filed a motion for summary judgment on June 28, 2021. (ECF No. 6 at 4.) Thereafter, on July 28, 2021, the Circuit Court of Kanawha County held a pre-trial conference, where the parties argued Defendant's motion for summary judgment. (*See* ECF No. 6–1 at 11, Ex. B.) On the day prior, however, Plaintiff filed a motion to amend the complaint. (*Id.* at 46, Ex. F.) The Circuit Court ultimately granted both Defendant's motion for summary judgment and Plaintiff's motion to amend, directing Plaintiff to specify "whether Plaintiff is bringing a claim for deliberate indifference under the West Virginia

Constitution or the United States Constitution." (*Id.* at 17, Ex. B.)

Plaintiff filed his Amended Complaint with the Circuit Court of Kanawha County on December 1, 2021, wherein he asserted violations of Decedent's rights under the United States Constitution and the West Virginia Constitution. (ECF No. 1–1.) Defendant then removed the matter to this Court invoking federal question jurisdiction pursuant to 28 U.S.C. § 1441 on December 10, 2021. (ECF No. 1.)

Defendant filed the instant Motion for Summary Judgment on June 13, 2022. (ECF No. 27.) Plaintiff timely filed his response in opposition on June 27, 2022. (ECF No. 30.) Defendant then timely filed its reply on July 5, 2022. (ECF No. 31.) With the briefing on this motion complete, it is ripe for adjudication.

## II.   *LEGAL STANDARD*

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment. It states, in pertinent part, that a court should grant summary judgment if "there is no genuine issue as to any material fact." "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). Summary judgment should not be granted if there are factual issues that reasonably may be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Thus, at the summary judgment phase, the pertinent inquiry is whether there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (alteration and internal quotation marks omitted).

The nonmoving party bears the burden of showing there is a "genuine issue of material fact for trial . . . by offering 'sufficient proof in the form of admissible evidence[.]'" *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).   When ruling on a motion for summary judgment, the Court must view the evidence "in the light most favorable to the opposing party."   *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

### III.   DISCUSSION

Defendant argues that it is entitled to summary judgment on each of Plaintiff's claims. First, Defendant argues that, under the Eighth Amendment, it cannot be held liable for Decedent's demise as Plaintiff cannot prove that a substantial danger existed, or that Defendant had actual knowledge of the danger thereof or that it acted with deliberate indifference thereto.   (ECF No. 28 at 10.)   As to Plaintiff's claim under Article III, Section 5 of the West Virginia Constitution, Defendant argues that the state does not recognize a claim under the West Virginia Constitution when other remedies are available to a plaintiff.   (*Id.* at 17.)   The Court shall turn first to Plaintiff's claim under Article III, Section 5 of the West Virginia Constitution, before addressing Plaintiff's Eighth Amendment claim.

### A.  Article III, Section 5 of the West Virginia Constitution

Defendant argues that it is entitled to judgment on Plaintiff's claim under the West Virginia Constitution because the West Virginia Supreme Court of Appeals has explicitly held that "West Virginia does not recognize a private right of action for monetary damages for a violation of Article III, Section 6 of the West Virginia [Constitution]."   (*Id.* at 18 (citing Syl. Pt. 3, *Fields v. Mellinger*, 851 S.E.2d 789 (W. Va. 2020).)   While recognizing that the state constitution does allow for judicial remedies for state constitutional violations, those instances "are only recognized where the

wronged party has no alternative means for remedying the alleged wrong."   (*Id.* at 17.)
Defendant asserts that the Supreme Court's reasoning in *Fields* applies with equal force here.   (*Id.*
at 18.)   In particular, Defendant contends that 42 U.S.C. § 1983 provides the "primary" cause of
action, thereby providing an alternative remedy such that his state constitutional action for money
damages is not recognized.   (*Id.* at 19.)

Plaintiff failed to respond to this argument.   A plaintiff's failure to respond to an argument
is typically treated as an abandonment of the claim.   *See   Pueschel v. United States*, 369 F.3d 345,
354 (4th Cir. 2004) (authorizing the district court, after allowing plaintiff an opportunity to
respond, to "rule on the [defendant's] motion and dismiss [the] suit on the uncontroverted bases
asserted therein."); *Blankenship v. Necco, LLC*, No. 2:16-cv-12082, 2018 WL 3581092, at *9 (S.D.
W. Va. July 25, 2018) ("The failure to respond to arguments raised in a motion for summary
judgment can indicate that the non-moving party concedes the point or abandons the
claim."); *Weller v. JP Morgan Chase Bank, Nat'l Ass'n*, No. 3:16-cv-110, 2017 WL 3581099, at
*2 (N.D. W. Va. Aug. 18, 2017) (finding the plaintiff abandoned their claims because they failed
to address the defendant's arguments).   Therefore, Plaintiff appears to have abandoned his claim
under Article III, Section 5 of the West Virginia Constitution.   Defendant's motion is therefore
**GRANTED** as to this claim.

*B.  Eighth Amendment – Deliberate Indifference*

Defendant next argues that it is entitled to summary judgment on Plaintiff's claim of
deliberate indifference because "Plaintiff cannot provide evidence (1) that Defendant had actual
knowledge of a substantial threat to [Decedent's] safety or (2) that Defendant acted with deliberate
indifference thereto."   (ECF No. 28 at 9.)   Defendant asserts that a claim of deliberate

indifference imposes a *mens rea* requirement, which requires proving that a prison official "*actually knew*" of a substantial risk to Decedent's safety and that the official "*actually knew*" his response to that risk was inappropriate.  (*Id.* at 10 (emphasis in original).)   In support of its argument, Defendant states that "the testimony of other inmates in the pod, correctional officers, and the investigating Trooper all demonstrate that the fight was a spontaneous act and that no prison official even knew the fight occurred until after the fight was over."  (*Id.* at 12.)

In response, Plaintiff argues that he can show that Defendant was deliberately indifferent because of the misclassification of Toppings.  (ECF No. 30.)   Specifically, Plaintiff asserts that Toppings was initially identified as having a history of "physically assaultive behavior" on the PREA Screening Instrument.  (*Id.*)   Thereafter, he was further transferred between units after "having problems."  (*Id.*)   Because the prison had actual knowledge of Toppings' history of "physically assaultive behavior," Plaintiff contends that Defendant "should have taken it into account when classifying [Toppings] and should have resulted in [Toppings] being separated from other inmates."  (*Id.* at 11–12.)   Moreover, Plaintiff argues that by violating its own policies and procedures, an inference of bad intent may be supported against Defendant.  (*Id.* at 13.) Accordingly, Plaintiff asserts that, in light of the above disputed facts, "a reasonable jury could conclude that the [Defendant] acted with 'deliberate indifference'," such that a grant of judgment in favor of Defendant is inappropriate.  (*Id.* at 14.)

To prevail on an Eighth Amendment claim, an inmate must show two things: (1) "the deprivation must be, objectively, 'sufficiently serious;'" that is, a "denial of 'the minimal civilized measure of life's necessities;'" and (2) the prison official had a "'sufficiently culpable state of mind;'" that is, "'deliberate indifference' to inmate health or safety."  *Farmer v. Brennan*, 511

U.S. 825, 834 (1994).   In *Farmer*, the Supreme Court of the United States held that the Eighth Amendment "imposes duties on [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"   *Id.* at 832.   Prison officials, accordingly, have a "specific" duty to protect inmates from violence perpetrated by other inmates.   *Id.*   "Such violence is not appropriately characterized as punishment and 'being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.'"   *Lacy v. DeLong*, Civ. Action No. 2:13-CV-14813, 2016 WL 3566242, at *6 (S.D.W. Va. June 27, 2016) (quoting *Farmer*, 511 U.S. at 833) (cleaned up).

Thus, pursuant to *Farmer*, a plaintiff must show a substantial risk of harm and that prison officials "knew of and disregarded an excessive risk to inmate health or safety."   *Freeland v. Ballard*, 6 F.Supp.3d 683, 689 (S.D. W. Va. 2014).   "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."   *Farmer*, 511 U.S. at 837.   *See also White by White v. Chambliss*, 112 F.3d 731, 737 (4th Cir. 1997) ("[D]eliberate indifference, at a minimum, implies that defendants were plainly placed on notice of a danger and chose to ignore the danger notwithstanding the notice.").

There can be no reasonable debate that Plaintiff has satisfied the first prong: Decedent's passing is without question a sufficiently serious deprivation.   Naturally, the parties focus on the second prong and the "deliberate indifference" standard.   Defendant focuses on the argument that "[n]o threat to [Decedent's] safety existed until the moment Toppings felt disrespected over the

debt," (ECF No. 28 at 8), while Plaintiff asserts that the substantial risk was Toppings himself the moment he was transferred to general population.   (ECF No. 30 at 12.)   Accordingly, the question that must be answered is whether Decedent was subjected to a substantial risk of serious harm that Defendant actually knew of and yet disregarded.   The answer is no.

Instructive to this matter is the Third Circuit's reasoning in *Bistrian v. Levi*, 696 F.3d 352 (3d Cir. 2012), *abrogated on other grounds as recognized in Mack v. Yost*, 968 F.3d 311, 319 n.7 (3d Cir. 2020).   There, the plaintiff was an inmate who had served as an informant for prison officials against members of a violent gang and their cohorts.   *Id.* at 358.   At various times during his incarceration, the plaintiff was transferred between the general population and a segregated housing unit.   *Id.* at 359–61.   During one of his stints in segregation, the plaintiff began passing notes between gang members, about which he informed prison officials.   *Id.*   The plaintiff subsequently began cooperating with the officials, bringing them the notes and allowing them to photocopy and share the notes with the Federal Bureau of Investigation.   *Id.* at 360.   After cooperating with officials for some time, the plaintiff's cooperation became known to members of the gang.   *Id.*   Plaintiff then began receiving threats from the gang, and in fact was beaten by several gang members in the segregation unit recreation yard.[2]   *Id.* at 361–62.

Some months later, the plaintiff was again attacked in the recreation yard, but this time, the assault was carried out by an inmate who had no connection to the gang.   *Id.* at 362.   Instead, this inmate had a history of violently attacking other inmates.   *Id.*   The plaintiff had had no prior

---

[2] The Court notes here that the plaintiff's deliberate indifference claim as to the attack committed by the gang members was allowed to proceed because the gang had a violent history, had made specific threats to the plaintiff on account of his cooperation with authorities, and the prison officials knew of the threats to the plaintiff but locked him in the recreation yard with the gang members anyway.   *Bistrian*, 696 F.3d 369.   While not the focal point of this Court's analysis, the gang assault is still instructive as it demonstrates that both a specific and significant risk to the plaintiff existed, and that the officials both knew of and disregarded that risk.

contact with this specific inmate.  *Id.*  The plaintiff argued that the inmate's "history of violent assaults against other inmates" placed him in a substantial risk of harm that was known and disregarded by officials when plaintiff was placed in the recreation yard.  *Id.*  The Third Circuit, however, disagreed and found that such a risk was too speculative: "[A]ccording to Bistrian, the risk of the harm that occurred was the risk that an inmate with a history of violence might attack another inmate for an unknown reason. We cannot conclude on these allegations that prison officials were deliberately indifferent to such a speculative risk."  *Id.*

The Seventh Circuit, in *Grievson v. Anderson*, 538 F.3d 763 (7th Cir. 2008), opined similarly.  There, the plaintiff was a federal pretrial detainee, and he shared a cell with Art Schlichter, a former quarterback for the Indianapolis Colts.  *Id.* at 767.  At the time, Schlichter was under investigation by a grand jury for ongoing gambling schemes.  *Id.*  One of the plaintiff's friends was a witness before that grand jury, and the witness then spoke with prison officials to have plaintiff moved given his proximity to the investigation.  *Id.*  Shortly after, the plaintiff was moved to barracks-style housing.  *Id.*  The plaintiff then suffered a series of assaults at the hands of other inmates, which he believed to be a result of his reputation as a "snitch," given the relationship with the grand jury witness  *Id.* at 768–69.  While he reported these assaults to officers, the plaintiff did not disclose who assaulted him, why he had been assaulted, or whether he continued to feel threatened.  *Id.* at 776.

Even in consideration of the repeated assaults, the Seventh Circuit reasoned that "[s]uch vague information did not put the jail officers on notice of a specific threat to Grieveson's safety." *Id.*  Rather than these inmates "lash[ing] out" at the plaintiff because of an alleged reputation as a snitch, the incidents instead "demonstrate[d] the tragic realities of jail and prison life that detainees

12

are often subject to, absent fault on the part of individual jail guards." *Id.* at 776–77.  Because plaintiff could not produce evidence that the officers knew of a specific substantial risk to himself that the officers disregarded, the Seventh Circuit affirmed the grant of summary judgment in favor of the defendant officers. *Id.* at 778.

Likewise, in *Fuller v. County of Charleston*, 444 F.Supp.2d 494 (D.S.C. 2006), the district court reasoned that prison officials could not be held liable where the plaintiff advanced no evidence demonstrating that the officials possessed actual knowledge that the plaintiff was in danger.  There, the plaintiff—a self-described "white collar" criminal—was housed in the same cell as an inmate who was imprisoned for a "brutal murder." *Id.* at 495–96.  During his detention, the plaintiff was assaulted and seriously injured by his cellmate. *Id.* at 496.  The plaintiff argued that the fact that prison officials placed him and the assailant together was "sufficient evidence of a deliberate indifference to dangerous conditions," and further that "based on established classification policies practices or procedures the Jail Management knew, or should have known, that incarcerating Plaintiff with a brutal alleged murderer would constitute a risk to [his] health, safety and well being." *Id.* at 498.  The district court flatly rejected the plaintiff's argument stating, "[t]he fact that Plaintiff was put in contact with other inmates, some of whom were incarcerated for violent crimes, is not evidence of any actual knowledge on the part of the prison officials that Plaintiff was in danger." *Id.*   Indeed, the district court specified that, "[a]bsent some evidence that prison officials were subjectively aware that this inmate was likely to attack Plaintiff, the mere fact that the attacking inmate was classified as potentially violent cannot constitute deliberate indifference." *Id.*

Here, the thrust of Plaintiff's argument is that inmate Toppings was misclassified and that Defendant should have considered his history of "physically assaultive behavior" into account and separated him from other inmates.  (ECF No. 30 at 12.)   While the Court remains unconvinced that Toppings actually was misclassified,[3] even if he was, this misclassification is insufficient to satisfy the high standard required to establish deliberate indifference.   Simply put, even viewed in the light most favorable to Plaintiff, Plaintiff has failed to show that Toppings' misclassification and subsequent housing put Decedent at a substantial risk of harm and that prison officials had actual knowledge of that risk and consciously disregarded it.

First, Plaintiff has put forward no evidence that Decedent was at a substantial risk of harm at the hands of Toppings.   To the contrary, the record reflects that the fight ultimately resulting in Decedent's passing was a spontaneous and quickly-escalating act, with little, if any, forewarning. Inmate Shy witnessed the fight, and stated that "[t]hey never had an issue until that day," and in fact had "never seen them even speak to each other."   (ECF No. 27–1 at 15–16.)   Even Toppings himself testified that "[t]here was never a disagreement between [them]."   (*Id.* at 33.)   Plaintiff's

---

[3] On this note, the entirety of Plaintiff's evidence to support the conclusion that Toppings was misclassified is the PREA Screening Form, where it is noted that Toppings possessed a history of "physically assaultive behavior."   (ECF No. 30–2.)   While Plaintiff's expert witness opined that Toppings had been misclassified on account of this history, he could not identify any specific instances of violence in Toppings' file or any of the reports he was provided, including any history of violence towards other inmates.  (ECF No. 27–1 at 67, 78.)   Furthermore, Corrections Officer Christopher Fleming noted in his deposition that the PREA Screening Form is not relied upon for classification, but only ensures that sexual predators are not housed with potential sexual victims.   (ECF No. 31 at 13, Ex. A.)   Corrections Officer Trenton Davis testified similarly, stating that "physically assaultive behavior" box on the PREA Screening Form would not be enough "to trigger some kind of different housing[.]"   (ECF No. 30–12 at 6.)   Finally, even if Toppings demonstrated physically assaultive behavior, Defendant's policy, while listing "propensity for violence" as a consideration in housing decisions, does not list violence as a mandated separation. (*See* ECF No. 30–1 (identifying male and female; felons and misdemeanants; pretrial and convicted; special management and general population; and trustees and general population as categories for mandatory separation, absent specific authorization of the Administrator)).   As demonstrated by the Reclassification and case Review Record, Toppings underwent a classification determination and was accordingly housed in general population.   (ECF No. 30–4.)   While this fact may be in dispute, it is not material as either way it is insufficient to show deliberate indifference, as will be explained.

14

expert witness, Howard Painter, similarly stated that the "first time [Toppings] had an issue" with Decedent was only in the minutes leading up to the fight.   (*Id.* at 72.)   Furthermore, Shy noted that at no time prior to the fight did Decedent seek protection from the correctional officers, contact anyone for help, or ask to move pods.   (*Id.* at 25–27.)   As Shy stated, the prison officials "couldn't have known anything," because the fight "happened so fast," and was a "freak incident."   (*Id.* at 20.)

Second, and much like the assault in *Bistrian*, there was simply no way for prison officials to know about or even infer that Decedent would be at substantial risk of harm merely from the fact that Toppings supposedly had a history of violent behavior.   *See Bistrian*, 696 F.3d at 362. Toppings had made no specific threats against Decedent and, by all accounts, Toppings and Decedent had no issues with each other.   (*See* ECF No. 27–1 at 15–16; 33; 72.)   Defendant knowing that Decedent was at a substantial risk of harm simply due to the fact that Toppings' PREA Screening Form indicated a history of physically assaultive behavior and transferred pods is simply far too speculative to satisfy the deliberate indifference standards.   *Bistrian*, 696 F.3d at 362.   *See also Rich v. Bruce*, 129 F.3d 336, 339 (4th Cir. 1997) ("[T]he findings do not establish that Bruce knew that his actions exposed Rich to a specific risk distinct from the general risks of violence from other inmates and Higgins to which Rich was always exposed[.]");   *Fuller*, 444 F.Supp.2d at 498.   ("Absent some evidence that prison officials were subjectively aware that this inmate was likely to attack Plaintiff, the mere fact that the attacking inmate was classified as potentially violent cannot constitute deliberate indifference.")

Unfortunately, this incident "demonstrate[s] the tragic realities of jail and prison life that detainees are often subject to, absent fault on the part of individual jail guards."   *Grieveson*, 538

F.3d at 776–77.   At worst, the record shows that Defendant either "did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed . . . that the risk to which the facts gave rise was insubstantial or nonexistent."   *Farmer*, 511 U.S. at 844.   Neither is actionable under a theory of deliberate indifference.   *See, e.g.*, *Makdessi v. Fields*, 716 Fed. App'x 148, 155 (4th Cir. 2017); *Fuller*, 444 F.Supp.2d at 498 ("The fact that Plaintiff was put in contact with other inmates, some of whom were incarcerated for violent crimes, is not evidence of any actual knowledge on the part of the prison officials that Plaintiff was in danger.")

Accordingly, for the reasons more fully explained above, Defendant's motion for summary judgment, (ECF No. 27), is **GRANTED**.

## IV.   CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendant West Virginia Division of Corrections and Rehabilitation's Motion for Summary Judgment.   (ECF No. 27.)   Accordingly, this case is **DISMISSED WITH PREJUDICE**.   The Court further **DIRECTS** the Clerk to remove this case from the Court's docket.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        August 9, 2022

THOMAS E. JOHNSTON, CHIEF JUDGE

16